SEALED BY ORDER OF THE COURT

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

FILED

JAN -6 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 22 003 JSW |
| Plaintiff, | VIOLATIONS: |
| v. | 18 U.S.C. § 1349 – Conspiracy to Commit Mail Fraud and Wire Fraud; 18 U.S.C. § 1341 – Mail Fraud; 18 U.S.C. § 1343 – Wire Fraud; |
| STACCATO POWELL, SHEILA QUINTANA, | 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture Allegation |
| Defendants. | OAKLAND VENUE |
| | **UNDER SEAL** |

INDICTMENT

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment:

1. The African Methodist Episcopal Zion Church ("AME Zion" or "Denomination") is a historically African-American Christian denomination. It was founded in 1796 and has approximately 1.4 million members worldwide.

2. The governing body of the Denomination is the General Conference, which convenes every four years. Between quadrennial meetings of this body, the AME Zion Church is administered by the Board of Bishops in accordance with the rules of the Denomination, which are laid out in the Book

of Discipline. Questions about interpretation of the Book of Discipline are heard by the Judicial Council for the Denomination.

3. The Denomination's Book of Discipline identifies the required mechanisms for transferring and encumbering properties, and further identifies the appropriate ownership status for congregational places of worship including specific title requirements.

4. Specifically, local church property cannot be disposed of or mortgaged outside of the safeguards established by the General Conference and set forth in the Book of Discipline as documented in, Book of Discipline (Paragraph 398, referred to as "The Trust Clause"):

> The Trustees shall not in any case whatsoever dispose of church property by sale or otherwise without the consent of the majority of the members in full connection, expressed by vote in a meeting called for that purpose, of which due notice has been given. Provided, however, that no congregation, Pastor, nor Trustee, Board or agent of the congregation shall mortgage or sell and property of the African Methodist Episcopal Zion church without confirmation of the Quarterly Conference and written consent of the Bishop.

5. The Book of Discipline includes additional provisions for all assets owned by an AME Zion church congregation through requirement of a trust clause for all property owned and maintained by local churches (Paragraph 394):

> In trust that said premises shall be used, kept, maintained, and disposed of as a place of divine worship for the use of the ministry, and membership of the African Methodist Episcopal Zion Church in America, subject to the provisions of the Discipline, usage and ministerial appointments of church, as from time to time authorized and declared by the General Conference of said church, and by the Annual Conference within whose bounds the said premises are situated. This provision is solely for the benefit of the grantee, and the grantor reserved no right or interest in said premises.

6. The AME Zion Church is geographically divided into 12 districts, each of which is led by a bishop. Within each geographical district, a bishop has wide authority, including the ability to fire and hire pastors of churches. The power of a bishop is, however, constrained by the Book of Discipline, by the Board of Bishops, and, ultimately, by the General Conference. The Denomination's Western Episcopal District is comprised of churches in Alaska, Arizona, California, Colorado, Oregon, and Washington.

7. At a local level, congregations are guided by a pastor, but self-govern in accordance with Denominational policy through quarterly congregational conferences ("Quarterly Conference").

Additionally, each local congregation utilizes a Board of Trustees which holds general responsibility for all real property held by the congregation, and a Board of Stewards which oversees all financial matters for the church. Both the Board of Trustees and the Board of Stewards are amenable and subject to the direction of the Quarterly Conference, made up of the congregation itself, which is further restrained by the Denominational church law as documented in the Book of Discipline.

8. Defendant STACCATO POWELL is a former bishop of the AME Zion Church. POWELL, a native of North Carolina, is a graduate of divinity school and law school. He was a pastor in the AME Zion Church for approximately 30 years before his selection in 2016 as bishop for the Western District of the AME Zion Church. At all times relevant, POWELL lived in Fontana, California; Granite Bay, California; and Wake Forest, North Carolina.

9. At all times relevant, Defendant SHEILA QUINTANA resided in Vallejo, California.

10. Shortly after his selection as Bishop, on or about October 28, 2016, POWELL, along with QUINTANA and other persons known and unknown to the Grand Jury, incorporated the AME Zion Western Episcopal District ("WED, Inc."), a corporation formed under the laws of the State of California.

11. The Articles of Incorporation/Bylaws of WED, Inc. were signed October 28, 2016, by officers including QUINTANA, a Chief Financial Officer. Article I stated, "The name of this organization shall be the AME Zion Western Episcopal District, Incorporated." Article III stated, "Governance of this organization shall be the responsibility of the Presiding Bishop of the Western Episcopal District of the A.M.E. Zion Church who is assigned by the General Conference of the African Methodist Episcopal Church, Inc. All board members of this organization, except the presiding bishop, shall serve a period of one year subject to re-nomination by the presiding bishop with confirmation from the Western Episcopal District of the A.M.E. Zion Church."

12. On or about March 1, 2017, Defendants and other persons known and unknown to the Grand Jury filed a Statement of Information for WED, Inc. with the Secretary of State of the State of California, listing POWELL as Chief Executive Officer and QUINTANA as Chief Financial Officer of WED, Inc. On or about October 24, 2018, Defendants and other persons known and unknown to the Grand Jury filed a Statement of Information for WED, Inc. with the Secretary of State of the State of

California, listing POWELL as Chief Executive Officer and QUINTANA as Chief Financial Officer of WED, Inc. On or about January 28, 2021, Defendants and other persons known and unknown to the Grand Jury filed a Statement of Information for WED, Inc. with the Secretary of State of the State of California, listing POWELL as Chief Executive Officer and another individual as Chief Financial Officer of WED, Inc.

13. On July 30, 2020, the entity WED, Inc. filed for Chapter 11 protection in the US Bankruptcy Court for the Eastern District of California. In a Schedule of Assets filed by the debtor, WED, Inc. claimed to own eleven churches, a parsonage, and POWELL's official residence. The filings in the case showed the real property was worth $26,338,031. The filings also showed debts on the properties in the amount of $12,475,453. The overwhelming majority of these liabilities were high-interest loans provided by private investors ("hard money lenders"). A Chapter 11 trustee was appointed on March 1, 2021, and he subsequently took control of the assets. The bankruptcy petition has not yet been discharged.

### The Scheme to Defraud

14. As set forth below, POWELL, QUINTANA, and others schemed to defraud the AME Zion Denomination and its congregations by misusing positions of trust to fraudulently obtain title to church property throughout the western United States, use church property as collateral for loans from hard money lenders, and use a portion of the loan proceeds to personally enrich themselves.

### Manner and Means

15. After formation of WED, Inc., POWELL, QUINTANA, and others fraudulently acquired title to the church properties through a campaign of pressure and misinformation targeting pastors who served at the pleasure of POWELL. In some cases, POWELL, QUINTANA, and others changed deeds for church properties under false pretenses, using forged signatures or other misrepresentations to create or obtain resolutions purporting to confirm congregational approval of their scheme. In other cases, pastors believed they were signing over their churches' grant deeds to the Denomination because POWELL falsely represented that their deeds were not compliant with the Book of Discipline. This compliance issue was manufactured by POWELL, whose real purpose was to acquire title to the properties so he could use the properties as collateral to obtain loans for purposes not sanctioned by the

Denomination, including to enrich himself and QUINTANA.

16. As part of fraudulently obtaining title to the properties, POWELL materially failed to disclose to the pastors and/or congregations that he would be using the properties as collateral for significant high interest loans that the congregations would be unable to repay. In some cases, POWELL omitted that information, such that the pastors and/or congregations had no idea that their churches would be encumbered. In other situations, POWELL suggested that their property might be used as collateral, but that the loan amounts would be small and manageable debt for the congregations. The pastors and congregations in those cases were still misled as to the size of the loans, the purpose of the loans, and their ultimate responsibility for paying off the debts.

17. Based on POWELL's false statements and material omissions, the pastors deeded the properties to WED, Inc., which was not an entity controlled by the Denomination but by POWELL personally as CEO. If any pastor expressed misgivings, POWELL and QUINTANA insisted that the pastor change the deeds to their congregations' properties, placing the properties in the name of WED, Inc. POWELL and QUINTANA falsely informed the dissenting pastors that the Denomination's governing rules required the change to the deeds.

18. After taking control of the church properties, POWELL, QUINTANA, and others used the real estate as collateral to obtain high interest loans. The total proceeds of the loans exceeded $14 million in net proceeds. Additional funds were recycled back into the various properties through refinance processes.

19. Throughout their scheme, POWELL, QUINTANA, and others known and unknown to the Grand Jury used or caused the use of interstate wire communications and/or mails in furtherance of the scheme.

*The Kyles Temple AME Zion Church of Vallejo*

20. At the beginning of his term as bishop, POWELL devised a plan to purchase an episcopal residence in the Western District – his official home – in Granite Bay, California.

21. To purchase the episcopal residence, POWELL and QUINTANA used the Kyles Temple AME Zion Church of Vallejo, California as collateral for a loan. At a February 2017 meeting in Atlanta, Georgia, POWELL told the pastor of Kyles Temple that he wanted to use Kyles Temple as

collateral. The pastor asked POWELL to provide a written proposal, in order to provide the congregation with the opportunity to approve it as required under the Denomination's Book of Discipline. Instead, POWELL, QUINTANA, and others encumbered Kyles Temple.

22. To obtain the loan, POWELL's assistant falsely claimed to be the secretary of Kyles Temple and provided a purported resolution from that church giving authority to QUINTANA to negotiate with lenders. QUINTANA obtained the loan on March 23, 2017, using Kyles Temple as collateral to borrow $500,000.

23. The pastor of Kyles Temple informed the congregation at a quarterly meeting on or about May 14, 2017, that he had no knowledge of, nor did he approve, any loan to be taken out on the church.

24. In an email dated May 17, 2017, QUINTANA asked POWELL, "When do you wish to inform Kyles Temple about the $500,000 loan we are guaranteeing?"

25. Shortly after the May 2017 quarterly conference meeting, POWELL removed the Kyles Temple pastor, who relocated to an AME Zion Church in Pennsylvania.

26. Lay leaders of Kyles Temple asked the Denomination's Judicial Council to rule on the issue of whether church property can be sold or mortgaged without consent of the congregation.

27. On November 3, 2017, the Denomination's Judicial Council informed POWELL and QUINTANA that the encumbering of Kyles Temple's property was contrary to church law. The Judicial Council told POWELL and QUINTANA that there was a four-prong test for such transactions, requiring: 1) approval by the congregation's board of trustees; 2) majority vote in a meeting of the congregation as a whole; 3) approval by the regional quarterly conference; and finally, 4) assent by the district's bishop.

*First AME Zion Church of San Jose*

28. After the difficulty in obtaining the loan against the Kyles Temple property, POWELL and QUINTANA moved ahead with their scheme. Instead of falsely representing their authority to encumber the congregations' properties, they used false representations and material omissions to induce the pastors or other congregation authorities to sign over the deeds to various properties to the "Western Episcopal District." POWELL and QUINTANA then used their control of WED, Inc, to encumber those properties with high interest loans that the congregations could not pay back.

29. On a date no later than September 24, 2017, QUINTANA, with POWELL's knowledge, sent a resolution to the First AME Zion Church of San Jose, California, and requested its execution. The resolution would have transferred title to the church's real property to the Western Episcopal District of the AME Zion Church. At a meeting on September 24, 2017, the congregation's board of trustees reviewed the resolution and the church's existing deed. The pastor of the church was present at that meeting. At a second meeting on October 1, 2017, the board of trustees concluded that the existing deed complied with Denomination policy and that there was no reason to approve the resolution transferring title. The pastor of the San Jose church was present at that meeting as well.

30. Despite the board of trustees' refusal to transfer the title, on or about October 6, 2017, QUINTANA prepared a false resolution purporting to memorialize a vote by the San Jose congregation authorizing the pastor of the San Jose church to sign the transfer of title. No such vote ever took place.

31. QUINTANA, with POWELL'S knowledge, submitted the false resolution along with a transfer of title signed by the pastor of the San Jose church in support of a hard money loan application using the property of the San Jose church as collateral. On October 18, 2017, a deed of trust mortgage on the church's property in the amount of $750,000 was recorded, with the loan proceeds of $719,101.67 net of expenses and costs paid to WED, Inc. QUINTANA and POWELL obtained subsequent mortgages in 2019 for $2,150,000 and $3,000,000 on the church's property, all without the knowledge or consent of the board of trustees.

*Obtaining Additional Titles and Loans*

32. On or about September 13, 2017, POWELL and QUINTANA falsely informed the pastor of University AME Zion Church of Palo Alto, California, that the congregation's property would be used as collateral to pay the debt of another AME Zion congregation in Sacramento. POWELL and QUINTANA falsely represented that if the pastor signed over the title, that the resulting loan would be no more than the $200,000 that the Sacramento church owed. POWELL and QUINTANA then consummated loans in an amount to exceed $3,000,000 using University AME Zion Church as collateral.

33. On or about October 5, 2017, POWELL and QUINTANA falsely informed the pastor of Greater Cooper AME Zion Church of Oakland, California, that church policy required him to sign over

the grant deed to the church and a related property. POWELL and QUINTANA did not inform the pastor that they intended to, and subsequently did, use Greater Cooper properties as collateral for high interest loans exceeding $2,000,000.

34. On or about October 10, 2017, POWELL and QUINTANA produced a fraudulent resolution purporting to state the approval of the congregation of First AME Zion Church of Los Angeles, California, for a $1,200,000 loan using the church property as collateral. POWELL and QUINTANA then used a fraudulent grant deed purporting to be signed by an authorized person to obtain loan using the First AME Zion Church of Los Angeles property as collateral. The loan documents indicate a close of escrow on December 28, 2017. The confirmation of wiring documents shows that $1,135,128.56 was wired to WED, Inc.'s bank account.

35. The encumbering of properties by POWELL and his co-conspirators was public record and it gradually became known to pastors and congregations. Some church members filed complaints within the AME Zion Church governing structure. On or about January 4, 2019, AME Zion Church authorities instructed POWELL to unwind his actions and return the deeds to the congregations. Nonetheless, POWELL, QUINTANA, and their co-conspirators continued to acquire and encumber properties.

*Use of Proceeds of the Scheme*

36. POWELL also used proceeds of loans made on Denomination properties for the benefit of himself and his family. For example, he used proceeds of the loan obtained on the First AME Zion Church of Los Angeles to add land to his family farm in Hallsboro, North Carolina. On or about November 15, 2019, POWELL used $14,000 in loan proceeds to pay down the mortgage debt on his personally-owned residence in Wake Forest, North Carolina.

37. Those loan proceeds were transferred via wire using a domestic electronic funds transfer system known as the Fedwire system, which is owned and operated by the United States Federal Reserve System. All Fedwire wire transfers alleged in this Indictment were electronically routed through Fedwire centers in East Rutherford, New Jersey, Dallas, Texas, or outside California and into accounts in the Northern District of California. All of the wire transfers alleged in this Indictment travelled between one state and another state.

38. QUINTANA also used her position to enrich herself. She drafted checks, drawn on WED, Inc.'s bank account, which she made payable to her husband. Her husband performed no services for WED, Inc.

39. In 2019, some of the church congregations began to receive notice that loans on their churches were in default. By mid-2020, all of the hard money loans were in default, and WED, Inc. filed for Chapter 11 bankruptcy protection.

40. The Denomination's Board of Bishops voted to relieve POWELL of his financial and administrative authority for the District on August 7, 2020, and informed him of that decision on August 8, 2020.

41. Despite being relieved of his authority, in November 2020 POWELL contacted the pastor of the AME Zion Church Sacramento to request that the pastor change the deed of that church to name WED, Inc., as owner.

42. On July 29, 2021, as noted above, the General Conference for the Denomination "disrobed" or stripped POWELL of his title as bishop.

COUNT ONE: (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud and Mail Fraud)

43. Paragraphs 1 through 42 of this Indictment are re-alleged and incorporated as if fully set forth here.

44. Beginning on a date unknown, but no later than on or about October 28, 2016, and continuing through on or about July 29, 2021, in the Northern District of California and elsewhere, the defendants,

STACCATO POWELL
and
SHEILA QUINTANA,

and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and mail fraud, in violation of Title 18, United States Code, Section 1341, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by omission and concealment of material facts, specifically by obtaining title to church properties and obtaining loans using those properties as

collateral, through making the false and fraudulent representations and material omissions as set forth in this Indictment.

45. All in violation of Title 18, United States Code, Section 1349.

COUNTS TWO AND THREE: (18 U.S.C. § 1343 – Wire Fraud)

46. Paragraphs 1 through 45 of this Indictment are re-alleged and incorporated as if fully set forth here.

47. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendants,

STACCATO POWELL
and
SHEILA QUINTANA,

having knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, that is, electronic funds transfers of loan proceeds to and from bank accounts controlled by POWELL and QUINTANA, as further set forth below:

| COUNT | DATE | WIRE TRANSFER |
|---|---|---|
| 2 | 12/29/2017 | $1,135,128.56 wire transfer via FedWire from Green Escrow Services, Inc.'s Mechanics Bank Account in Walnut Creek, California to WED, Inc.'s Bank of Stockton Account. |
| 3 | 11/15/2019 | $14,000 wire transfer via FedWire from WED, Inc.'s Wells Fargo Account to SN Servicing's Account in Eureka, California. |

48. All in violation of Title 18, United States Code, Section 1343.

COUNT FOUR: (18 U.S.C. § 1341 – Mail Fraud)

49. Paragraphs 1 through 48 of this Indictment are re-alleged and incorporated as if fully set forth herein.

50. On or about the date set forth below, in the Northern District of California and elsewhere, defendant,

STACCATO POWELL,

having knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, knowingly deposited and caused to be deposited to be sent and delivered by a private and commercial interstate carrier the following mailing for the purpose of executing such scheme and artifice:

| COUNT | DATE | ITEM MAILED |
|---|---|---|
| 4 | 12/29/2017 | Grant Deed to the African Methodist Episcopal Zion Church, also known as the First Church of Los Angeles, sent via Federal Express by POWELL from Georgia to San Ramon, California |

51. In violation of Title 18, United States Code, Section 1341.

FORFEITURE ALLEGATION: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

52. The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

53. Upon conviction for any of the offenses set forth in this Indictment, the defendants,

STACCATO POWELL
and
SHEILA QUINTANA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations.

If any of the property described above, as a result of any act or omission of the defendant:

    a.    cannot be located upon exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

|   |   |   |
|---|---|---|
| 1 | c. | has been placed beyond the jurisdiction of the court; |
| 2 | d. | has been substantially diminished in value; or |
| 3 | e. | has been commingled with other property which cannot be divided without |
| 4 |   | difficulty, |

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED: January 6, 2022

A TRUE BILL.

███████████████
FOREPERSON

STEPHANIE M. HINDS
United States Attorney

/s/ *Jonathan U. Lee*
JONATHAN U. LEE
SAMANTHA BENNETT
Assistant United States Attorneys